Christopher S. Marchese, (SBN 170239), marchese@fr.com
FISH & RICHARDSON P.C.
555 West Fifth Street, 31st Floor
Los Angeles, CA 90013
Telephone: (213) 533-4240
Facsimile: (858) 678-5099

Michael M. Rosen (SBN 230964), rosen@fr.com
Joanna M. Fuller (SBN 266406), jfuller@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Andrew R. Kopsidas (admitted *Pro Hac Vice*), kopsidas@fr.com
FISH & RICHARDSON P.C.
1425 K Street, N.W., 11th Floor
Washington, DC 20005
Telephone: (202) 783-5070
Facsimile: (202) 783-2331

Attorneys for Plaintiff, CH$_2$O, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CH$_2$O, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MERAS ENGINEERING, INC.; HOUWELING'S NURSERIES OXNARD, INC.; HNL HOLDINGS LTD.; HOUWELING UTAH OPERATIONS, INC.; and HOUWELING'S NURSERIES LTD.,<br><br>Defendants. | Case No. CV-13-8418 JAK (GJSx)<br><br>**CH$_2$O, INC.'S MOTION *IN LIMINE* NO. 8 TO EXCLUDE IMPROPER EXPERT TESTIMONY**<br><br>Date: May 16, 2016<br>Time: 3:00 p.m.<br>Courtroom: 750<br>Hon. John A. Kronstadt |

CH$_2$O'S MOTION *IN LIMINE* NO. 8 TO EXCLUDE IMPROPER EXPERT TESTIMONY
Case No. CV-13-8418 JAK (GJSx)

Plaintiff CH$_2$O, Inc. ("CH$_2$O") moves *in limine* to preclude Meras and Houweling's (collectively "Defendants") from introducing expert testimony not referenced in Defendants' experts' reports or inconsistent with the standards the expert applied in reaching his conclusions.

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. Furthermore, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . ." Fed. R. Evid. 403. "Although the trial court has substantial discretion in determining the evidence to be admitted, the ultimate fact must be 'of consequence to the determination of the action,' in the words of Federal Rule of Evidence 401." *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 961 (Fed. Cir. 1997). "In any trial there is a risk that in McCormick's phrase, 'the sideshow will swallow up the circus.'… That is that side issues of only tangential relevance will take up inordinate time and divert the jury from the real issues in the case. The trial court's weapons to prevent this [include] the Federal Rule of Evidence 403 ...." *Buckley v. Evans*, No. 2:02-cv-01451, 2007 WL 2900173, at *4 & n.13 (E.D. Cal. Sept. 28, 2007).

Unfair prejudice, as used in Rule 403, "involves an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Larez v. City of Los Angeles*, 946 F.2d 630, 641 n.5 (9th Cir. 1991) (quoting Notes of the Advisory Committee on the 1972 Proposed Rules for Fed. R. Evid. 403). "Probative value is determined by how likely the evidence is to prove some fact, not how important proof of that fact is to the proponent's case." *Am. Home Assur. Co. v. Am. President Lines, Ltd.*, 44 F.3d 774, 779 (9th Cir. 1994).

**1. The Court should exclude expert testimony not disclosed in Defendants' experts' reports.**

The Court should exclude as irrelevant and prejudicial any opinions not disclosed in Defendants' experts' reports. In particular, Defendants' damages expert

Dr. Micah Siegel should be precluded from testifying at trial on issues upon which Defendants elected not to ask him to opine in his expert report.

By way of example, first, CH2O's damages expert, Dr. DeForest McDuff, opined in his report that $CH_2O$ is entitled to lost profits from Meras totaling approximately $1.7 million. [Ex. 2 (Report of DeForest McDuff, Ph.D.) at ¶ 73.] But neither in his responsive expert report nor in his deposition did Dr. Siegel offer any type of analysis of lost profits.

Indeed, at his deposition, Dr. Siegel confirmed that his report did not contain any discussion of, let alone opinion about, lost profits because he was not tasked with analyzing them:

> Q. I did not see any opinions in your expert report on lost profits. Am I right?
> A. That's correct.
> Q. And Dr. McDuff offered opinions on – on lost profits, correct?
> A. I believe so.
> Q. And did you read or review the sections in Dr. McDuff's report on lost profits carefully?
> A. I read through them. But since that was outside the scope of my task, I did not read them as carefully as I did other portions that were within the scope of my task.
> Q. Did you read them carefully, the portions on lost profits?
> ***
> A. I read through them, but I didn't read them as carefully as I read other
> portions.
> Q. And then there were attachments associated with the lost profits opinions, correct?
> A. I believe so.
> Q. Did you review those carefully?
> ***
> A. I read them, but I didn't review them as carefully as I did those attachments that related specifically to -- to reasonable royalty.

[Ex. 25 (Siegel Depo. Tr.) at 44:20 – 45:23.]

In addition, Dr. Siegel repeatedly testified at his deposition that he did not perform a lost-profits analysis of any kind. Specifically, he testified that "I didn't do a lost profits analysis here. The analysis that I did was specifically tied to the facts of the reasonable royalty analysis." [*Id.* at 260:21-23; *see also id.* at 310:1-2 ("the lost profits is not an analysis that I did"); *id.* at 314:19 ("I was not tasked with doing a lost profits."); *id.* at 315:18-19 ("I didn't do a lost profits analysis 19 here").]

Second, Dr. McDuff opined in his damages report about how the parties, during the hypothetical negotiation, would equitably "share in the economic value generated by the technology based on their relative contributions and economic negotiation," value that included increase yield, increased quality, and reduced compliance costs resulting from increased water recirculation. [Ex. 2 (Report of DeForest McDuff, Ph.D.) at ¶¶ 108-115.] He ultimately concluded that $CH_2O$ and Meras would share that value relatively equally but that, between $CH_2O$ and Houweling's, $CH_2O$ would receive 38.5% of the value while Houweling's would receive 62.5% [*Id.*] Here, again, Defendants elected not to ask Dr. Siegel to analyze or opine upon these issues, and he in fact did not include any such analysis in his report.

Indeed, at his deposition Dr. Siegel admitted that he did not perform his own profit split analysis because "the methodology by which one arrives at the correct number is not, by any means, to look at…what would we [*sic*.] call the economic surplus and then try to split it up between the two." [Ex. 25 (Siegel Depo. Tr.) at 328:1-11.] Dr. Siegel also acknowledged that he did not review or respond in any way to the expert reports of CH2O experts Ken Gerhart, Shawn Hagerty, or Dr. Slav Hermanowicz. [*Id.* at 46:2-11.] He further conceded that he had "no knowledge of the economics of recirculating water." [*Id.* at 374:5 – 377:8.]

Defendants and Dr. Siegel had every opportunity to analyze and respond to Dr. McDuff's opinions on these issues, and yet they elected not to, neither in his report

nor at his deposition. Permitting Defendants at trial to introduce testimony on these issues would severely prejudice CH2O, which had no opportunity to explore them with Dr. Siegel at his deposition. *See* Fed. R. Civ. P. 26(a)(2) and 26(e)(2) (requiring disclosure of "[a]ny additions or changes" to an expert's opinions). Accordingly, CH2O respectfully requests that the Court preclude Defendants and Dr. Siegel from presenting any testimony on matters not referenced in his report.

### 2. The Court should exclude expert testimony premised on the wrong legal standard or, in the alternative, inconsistent with the standards applied by the expert in reaching his conclusion.

The Court should preclude Defendants' experts from testifying on the basis of the wrong legal standard or, in the alternative, in a manner inconsistent with the standards they applied in reaching their conclusions. Specifically, Defendants' technical expert Dr. Bernard Bubnis testified during his deposition that he applied the wrong legal standards and examined the wrong evidence when opining that the asserted claims were invalid as inoperable under 35 U.S.C. § 101 and as not enabled under 35 U.S.C. § 112. He should not be permitted to apply these incorrect standards; at a minimum, he should not be permitted to alter these standards at trial.

The '470 patent is presumed to be valid under 35 U.S.C. § 282(a) unless Defendants come forward with clear and convincing evidence to the contrary. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S.Ct. 2238, 2242 (2011). "A claimed invention is deemed inoperative under section 101 when it requires the impossible or an unattainable result. Therefore, only when a claimed invention has total incapacity to achieve what is claimed is it deemed inoperable." *Transco Products, Inc. v. Performance Contracting, Inc.*, 121 F.3d 728 at *5 (Fed. Cir. 1997). The enablement requirement of 35 U.S.C. § 112, ¶ 1 requires that the specification adequately discloses to one skilled in the relevant art how to make, or in the case of a process, how to carry out, the claimed invention without undue experimentation. *See Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365

(Fed. Cir. 1997).

But rather than apply these standards, long-recognized in patent law, Dr. Bubnis admitted at his deposition that he instead applied a "peer review" standard in reaching his invalidity conclusions under Sections 101 and 112. Specifically, he testified that:

> I looked at [the '470 patent] as I would look at a peer review for a submitted journal, article, or submitted thesis, the information needs to be explanative; by that I mean the information has to provide what is happening, why it is happening, how it happens.
>
> * * *
>
> So when I looked at '470 and looked at the composite information that I had, that was the baseline that I moved off of, that's what I was thinking when I was doing this. Would I publish this in a journal, would I accept this as a thesis, does it support that kind of quality that is necessary.

[Ex. 23 (Bubnis Depo. Tr.) at 34:7 – 35:16; *see also id*. at 110:16-24 (testifying that he found the '470 patent to be invalid under §§ 101 and 112 at least in part because it did not meet the standard of "peer review proof that [catalysis is] occurring").] Applying this "peer-review" standard, Dr. Bubnis further explained the types of information he believes are required to be present in the '470 patent's disclosure for it to be valid:

> The experimental plan needs to have a QC/QA assurance component to it, so that any measurements that are made, any measurements that are presented, need to be able to have a baseline error calculation, need to have understanding of data quality, accuracy and precision.

*[Id*. at 34:15-21; *see also id*. at 106:6-22 (applying peer-review standard as part of § 112 analysis).] When specifically asked what information Dr. Bubnis believes must be included in the '470 patent in order for it to be valid under §§ 101 and 112, he

listed a "validated data package," "proper quality control elements," "blanks," "duplicates," "third-party validation," and "third-party samples." [*Id*. at 101:7 – 102:25.] He further testified that validity under § 112, in his opinion, requires a showing of "proofs from peers" and "proofs from people who have tested it," as well as "quality assurance procedures" and "third party validation." [*Id*. at 107:25 – 109:2.] In addition, Dr. Bubnis cited as evidence of invalidity the testing that CH2O conducted to determine ***infringement***. [Ex. 26 (Expert Invalidity Report by Bernard Bubnis, Ph.D.) at 65-67.] However, whether a patent claim is invalid under §§ 101 or 112 is based on the disclosure of the patent, not on anything outside of its four corners. *See Ariad Pharm., Inc. v. Eli Lilly & Co*., 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*) (the test for written description "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art").

Because Dr. Bubnis applied the incorrect standards and examined the wrong evidence in reaching his invalidity conclusions under Sections 101 and 112, he should not be permitted to testify at trial about these matters. As CH2O explained in its summary judgment motion and during the summary judgment hearing, permitting Dr. Bubnis to testify using the wrong standards and evidence would hopelessly confuse the jury and prejudice CH2O. Fed. R Evid. 403.

In the alternative, should the Court decline to exclude this testimony altogether, Dr. Bubnis should not be permitted at trial to alter the standards he admitted at deposition he used to evaluate the patent. During the summary judgment hearing, counsel for Defendants suggested they may ask Dr. Bubnis to testify on the basis of the correct legal standard. But this, too, would prejudice CH2O, to whom Dr. Bubnis unequivocally testified that he used the incorrect standard in reaching his conclusions. *See* Fed. R. Civ. P. 26(a)(2) and 26(e)(2) (requiring disclosure of "[a]ny additions or changes" to an expert's opinions).

Accordingly, CH2O requests that the Court exclude Dr. Bubnis's legally unsound opinion on invalidity under Sections 101 and 112 or, in the alternative, preclude Dr. Bubnis at trial from altering the standards he admitted at deposition that he used to evaluate the patent-in-suit.

Dated: May 2, 2016          FISH & RICHARDSON P.C.

By: */s/ Christopher S. Marchese*
    Christopher S. Marchese
    marchese@fr.com

Attorneys for Plaintiff, CH$_2$O, INC.

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 2, 2016 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system. Any other counsel of record will be served by electronic mail and regular mail.

/s/ Christopher S. Marchese
Christopher S. Marchese
marchese@fr.com

CH$_2$O'S MOTION *IN LIMINE* NO. 8 TO EXCLUDE IMPROPER EXPERT TESTIMONY
8       Case No. CV-13-8418 JAK (GJSx)